# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, | ) ) ) | Civil Action No. 1:17-CV-02034-TSC |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| E. SCOTT PRUITT, in his official capacity as Administrator of the U.S. Environmental Protection Agency, *et al*. | ) ) ) | |
| Defendants. | ) ) ) | |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS

# TABLE OF CONTENTS

**PAGE**

I.   INTRODUCTION ............................................................................................................... 1

II.  ARGUMENT ..................................................................................................................... 3

   A.   Even at the Pleading Stage, NRDC Cannot Rely on General, Conclusory
       Allegations of a Geographic Nexus Between Its Members and the Products
       Named In the Complaint; It Must Allege Facts Showing That Such a Nexus
       Is Plausible. ................................................................................................................. 3

   B.   NRDC Disclaims Bringing a Programmatic Challenge, But Its Complaint Has
       the Trappings of a Programmatic Challenge Nonetheless. ................................................. 14

III. CONCLUSION ................................................................................................................. 17

# TABLE OF AUTHORITIES

**CASES**                                                                                                    **PAGE**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...................................................................................................... passim

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...................................................................................................... passim

*Ctr. for Biol. Div. v. EPA*,
   861 F.3d 174 (D.C. Cir. 2017) ("CTP") .......................................................................... 11, 12

*Conley v. Gibson*,
   355 U.S. 41 (1957) ............................................................................................................... 4, 5

*Ctr. for Biol. Div. v. EPA*,
   2013 WL 1729573 (N.D. Cal. Apr. 22, 2013) ................................................................. 15, 17

*Friends of the Earth v. Laidlaw Envtl. Servs.*,
   528 U.S. 167 (2000) ............................................................................................................... 15

*Lewis v. Casey*,
   518 U.S. 343 (1996) ............................................................................................................... 15

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ............................................................................................................... 4, 5

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ................................................................................................. 4, 5, 14, 16

*Mass. v. EPA*,
   549 U.S. 497 (2007) ............................................................................................................... 12

**STATUTES**

5 U.S.C. § 706 ............................................................................................................................. 10
7 U.S.C. § 136a ........................................................................................................................... 13
7 U.S.C. § 136a(c)(3)(B) ............................................................................................................ 10
7 U.S.C. § 136j(a)(2)(G) ......................................................................................................... 8, 13
7 U.S.C. § 136w-8(b)(3) ............................................................................................................ 10

**FEDERAL REGULATIONS**

40 C.F.R. Parts 152-158 ............................................................................................................... 1

## I.    Introduction

Fundamentally, the complaint filed by the Natural Resources Defense Council ("NRDC") in the above-captioned matter fails for lack of standing because it purports to challenge 59 individual pesticide product registrations without pleading any facts that plausibly show that each (or any) of the registered products have been, or will be, applied in areas where NRDC's members view, or search for, listed species. NRDC has attempted to bolster its complaint with declarations from individual members, but the declarations suffer from the same shortcomings as the complaint. Like the complaint, the declarations do not provide facts that plausibly suggest the existence of a geographic nexus between NRDC's members and the pesticide products identified in the complaint.

NRDC's simple explanation is that this is only the pleading stage. NRDC asserts that, at this stage, it only needs to plead "general allegations" (Pl's Opp. at 11 (ECF No. 24)) and that the Court may presume the particular facts necessary to support its claims. That is an overstatement. The Supreme Court has explained that "Rule 8 does not empower respondent to plead the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 687 (2009) (citation omitted). The complaint must include enough "factual enhancement [to cross] the line between possibility and plausibility." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (citations omitted). NRDC's complaint here does not cross that line. It offers nothing more than the sheer possibility that its members could be harmed by the 59 products identified in its complaint. Any allegations of a geographic nexus between NRDC's members and the individual products are wholly conclusory, and as such cannot be credited even at the pleading stage.

As the Environmental Protection Agency ("EPA") has explained, the total absence of factual allegations regarding the individual product labels, approved uses, and geographic areas

1

of use of the products named in the complaint illustrates that NRDC's true grievance is not with those particular products – or any particular product – but with the entire class of neonicotinoid pesticide products.  The 59 products singled out in the complaint are merely examples of NRDC's generalized grievance.  Although NRDC disclaims bringing a programmatic challenge, its "general allegation" approach to pleading is not meaningfully different from such a challenge. If a plaintiff may initiate litigation against individual product registrations based on its generalized grievance, then it is essentially gaining review of an agency's entire program.  And in such a scenario, the only thing that would limit the number of product registrations that a plaintiff could challenge would be the statute of limitations and the plaintiff's ambition. NRDC's generalized grievance against all neonicotinoid pesticide products does not, however, grant it license to challenge individual product registrations at will.  NRDC must plead the requisite facts that plausibly suggest the existence of a geographic nexus between its members and each particular product it identifies and, hence, NRDC's standing to challenge that product's registration.

It is no answer for NRDC to complain here that actually pleading factual allegations regarding each product registration it challenges is too burdensome.  NRDC obviously controls its complaint and it was its decision to challenge numerous agency actions.  EPA does not seek to prevent NRDC from realizing efficiencies in pleading to the extent that there may be factual overlap in its claims for relief against certain product registrations.  But here, NRDC has not alleged even basic facts that overlap in this manner.  Because NRDC's complaint fails to plead facts that cross the line between the mere possibility that it may have standing and plausibility of standing, it should be dismissed.

II.     **Argument**

    A.     **Even at the Pleading Stage, NRDC Cannot Rely on General, Conclusory Allegations of a Geographic Nexus Between Its Members and the Products Named In the Complaint; It Must Allege Facts Showing That Such a Nexus Is Plausible.**

The parties agree that, because NRDC has filed suit on behalf of its members, and not on its own behalf, it has standing to sue only to the extent that "its members would otherwise have standing to sue in their own right." Pl's Opp. at 8.  NRDC has failed to plead facts, however, that could establish the standing of its members to sue in their own right.  In particular, NRDC has pleaded no facts that could plausibly establish a geographic nexus between its individual members and any of the 59 products named in the complaint.  The complaint is devoid of any specific allegations that the 59 products at issue have been, or will be, applied in any particular areas where NRDC's individual members view or search for listed species, much less that those products will be applied in such a way as to cause a concrete injury to those members.[1]  In fact, the complaint is devoid of any factual allegations whatsoever that are specific to any of the 59 products whose registrations NRDC asks the Court to vacate.[2]

---

[1] NRDC asserts that EPA has "found" that acetamiprid, dinotefuran, and imidacloprid "pose dangers to threatened and endangered species" (Pl's Opp. at 4), which is inaccurate.  The reviews to which NRDC refers are screening-level assessments that *assume* the presence of all listed species where the pesticides are applied.  The screening-level assessments do not represent actual, real-world effects determinations for listed species.

[2] For instance, the complaint does not include well-pleaded facts regarding such basic facts as: (1) the type(s) of agriculture present in each of the geographic areas where NRDC's individual members view or search for each of the 24 species identified in the complaint; (2) the likelihood that pesticides are being used in those type(s) of agriculture, the type(s) of pesticide(s) being used, the volume, and the method(s) of application; (3) the proximity of the agricultural operation(s) and potential pesticide application to the geographic areas used by NRDC's members; (4) the types of agriculture for which each of the 59 products named in the complaint have been approved for use and by what method(s) of application; and (5) how NRDC's members' ability to view each of the 24 species identified in the complaint in the identified

NRDC nominally asserts that its complaint does, in fact, "link[] the challenged pesticide products with the locations" used by its members to view or search for listed species, offering a sweeping reference to 31 paragraphs from the complaint (*i.e.*, ¶¶ 51-72, 74-82).  Pl's Opp. at 13.  The Court will find no well-pleaded facts in those 31 paragraphs, however, that the 59 particular pesticide products named in the complaint are, as NRDC asserts, "used in and adjacent to the habitats of the species" or, more relevantly, the particular areas used by NRDC's members.  *Id*.  NRDC's more considered stance is that it is simply not required to plead facts that relate to the application of the specific products identified in the complaint, but rather that it need only allege generally that "pesticides" are used "in and adjacent to the habitats of the species" of interest to its members.  *Id*.  For this assertion, NRDC relies heavily on a quotation from *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992), which states that a court assumes at the pleading stage that a complaint's "general allegations embrace those specific facts that are necessary to support the claim."  Pl's Opp. at 8, 9, 10, 14 (citing *Defs. of Wildlife*).  The quotation in *Defs. of Wildlife* is attributed to *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883–889 (1990), which, in turn, cites to *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

None of these decisions saves NRDC's complaint from dismissal here.  As an initial matter, *Defs. of Wildlife* and *Nat'l Wildlife Fed'n* are not directly on point here because the Court did not actually consider the adequacy of the factual allegations in the complaint in either opinion.  *Defs. of Wildlife*, 504 U.S. at 559; *Nat'l Wildlife Fed'n*, 497 U.S. at 889.[3]  More

_____

geographic areas has been, or will be, injured by use of the 59 pesticide products named in the complaint.

[3] Although this case is not at the summary judgment stage like in *Defs. of Wildlife* and *National Wildlife Fed'n*, those decisions should inform what factual allegations NRDC must plead here, in order to prove later.  In particular, because "a plaintiff claiming injury from environmental damage must [prove that it] use[s] the area affected by the challenged activity and not an area roughly 'in the vicinity' of it," *Defs. of Wildlife*, 504 U.S. at 565 (citing, *inter alia*, *National*

importantly, *Conley*, 355 U.S. 41, the ultimate source of the quotation relied on by NRDC, was abrogated in *Twombly*, 550 U.S. at 557.  Specifically, in *Twombly*, the Court retired *Conley*'s "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  550 U.S. at 561 (citing *Conley*, 355 U.S. at 45–46).

The Court determined in *Twombly* that *Conley*'s "no set of facts" standard could no longer be allowed to stand because it could allow "a wholly conclusory statement of claim [to] survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery."  *Id*.  This overly-lenient pleading standard, the Court explained, was contrary to Federal Rule of Civil Procedure 8.  While Rule 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, the Rule requires that the "plain statement" possess "enough heft to 'sho[w] that the pleader is entitled to relief.'"  *Id*. at 557.  A plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id*. at 555 (citations omitted).  Rather, the complaint must include enough "factual enhancement [to cross] the line between possibility and plausibility."  *Id*. at 557.

Thus, in *Twombly* – an antitrust case wherein the plaintiffs were required to prove the existence of an unlawful agreement not-to-compete – the Court reversed the court of appeals' finding that "the prospect of unearthing direct evidence of conspiracy [was] sufficient to

---

*Wildlife Fed'n*, 497 U.S. at 887-89), and also must demonstrate concrete plans to visit that specific area, and not just "some day" intentions to do so, *Defs. of Wildlife*, 504 U.S. at 564, it is reasonable to require NRDC to plead facts here showing that its members have concrete plans to use particular areas where the particular pesticide products named in the complaint are being used.

preclude dismissal, even though the complaint d[id] not set forth a single fact in a context that suggests an agreement." *Id*. at 561-62.  The plaintiffs' bare allegation of conspiracy, devoid of underlying factual allegations, amounted to a mere legal conclusion that did not meet the requirements of Rule 8.  *Id*. at 556.  In addition, while the well-pleaded, nonconclusory factual allegation of parallel behavior by the defendants was consistent with the existence of an unlawful agreement, it did not support a plausible inference that such an agreement actually existed.  Thus, "[b]ecause the plaintiffs [had] not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."  *Id*. at 570.

The Supreme Court confirmed its retirement of *Conley*'s "no set of facts" standard in *Iqbal*, 556 U.S. 662, and elaborated on *Twombly*'s plausibility standard for factual pleading.  The Court reiterated in *Iqbal* that, while "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id*. at 678  (citation omitted).  More specifically, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'"  *Id*. at 679.  As stated in *Twombly*, a complaint can survive a motion to dismiss only if it meets a plausibility standard, which is "not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id*. at 678 (citation omitted).  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id*. 679 (citation omitted).  "In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more

than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*. at 679.

NRDC's complaint in this case fails to meet the plausibility standard established in *Iqbal* and *Twombly* under Rule 8.  Like the complaint in *Twombly* that did not "set forth a single fact in a context that suggest[ed] an agreement" not-to-compete, 550 U.S. at 561-62, the complaint here does not allege facts in a context that suggests any of the 59 particular pesticide products identified in the complaint have been, or will be, applied in the areas where NRDC's members view the identified ESA-listed species of interest.  The complaint offers only boilerplate allegations, unsupported by facts, that the products named in the complaint are used in the habitat and in areas adjacent to or hydrologically connected to the habitat of the species of interest to NRDC's members. *Id*. ¶¶ 59, 64, 69, 72; *see also id*. ¶¶ 52-58, 62-63 (boilerplate allegations that 15 of the 24 species occur in "agricultural areas or other areas where *neonic pesticides* are commonly used" (emphasis added)).

The 13 declarations submitted by individual members of NRDC do not improve upon the complaint in this regard.  The declarants "further describe [their] aesthetic interests" in certain listed species (Pl's Opp. at 1), but none provides any factual testimony that plausibly suggests the products identified in the complaint have been, or will be applied in the areas where the members view or search for those species.  Rather, the declarants speculate at a very general level that some unspecified pesticide product(s) may have been applied in the general vicinity of the areas they visit.[4]  NRDC does not dispute, however, that there are hundreds of different

___

[4] *See* Tanderup Decl. ¶ 7 (ECF No. 24-12) ("I'm guessing that our neighbors probably use" unspecified neonicotinoid  products); Cummings Decl. ¶ 7 (ECF No. 24-7) ("there's a lot of agriculture in the watersheds where the rabbitsfoot mussel [and the dwarf wedgemussel]" live); McDevit Decl. ¶ 8 (ECF No. 24-9) ("Around the Babcock/Webb Wildlife Management Area, there are some farms and residential developments, and I'd hate to think that their use of

neonicotinoid products and that those hundreds of products are not all approved for the same

uses, but rather are registered for different types of crop and non-crop uses by different methods

of application and, hence, are likely to be applied in different geographic areas.  These

differences matter because they represent legal limitations on where and how the various

products each may be used.  *See* 7 U.S.C. § 136j(a)(2)(G) (unlawful to use a registered pesticide

product in a manner inconsistent with its labeling).

Viewed in this context, common sense dictates that NRDC's allegations of a geographic

nexus between the 59 pesticide products named in the complaint and its members are "wholly

conclusory" and therefore not entitled to the assumption of truth.  *Twombly*, 550 U.S. at 561.  For

this Court to find that NRDC's allegations of geographic nexus are not entitled to the assumption

---

pesticides could affect our chances of seeing a red-cockaded woodpecker there"); Bohigian Decl.
¶ 6 (ECF No. 24-3) ("I know a lot of vernal pools are located around farm fields or yards where
people may be using" pesticide products, particularly "insecticides like neonicotinoids
('neonics')"); Byrd Decl. ¶ 9 (ECF No. 24-4) ("Neonics are used so widely these days that it's
hard to escape them"); Cohen Decl. ¶ 6 (ECF No. 24-6) ("In the [Research] Triangle . . . there's
probably a fair amount of pesticide use" and "I see my neighbors spraying pesticides on their
lawns," and "I know pesticide runoff, especially from neonicotinoid pesticides ("neonics") can
get into the waterways"); Benninghoff Decl. ¶ 10 (ECF No. 24-2) ("We're surrounded by corn
and soybean farms here, so that probably puts us square in the middle of neonic contamination");
Morello Decl. ¶ 6 (ECF No. 24-10) ("there is a decent amount of farming around the Atchafalaya
Basin, and . . . pesticide runoff, like from neonicotinoid pesticides, can get into the water");
Zielinski Decl. ¶ 8 (ECF No. 24-14) ("I know my neighbors use pesticides that probably contain
neonics" and "I suspect" that cemeteries next to parks use pesticide products that "contain
neonics too"); Walker Decl. ¶ 8 (ECF No. 24-13) ("I know that people use [unspecified
neonicotinoid s] in Kauai on farms and in home gardens"); Byrne Decl. ¶ 9 (ECF No. 24-5) ("the
Midwest is full of" "neonicotinoid pesticides ('neonics')" and that "[f]arming is the chief use of
land around most of the natural areas I visit, and I know Lake Wisconsin, for one, has had issues
with aerial pesticide spraying and agricultural runoff"); Kruer Decl. ¶ 6 (ECF No. 24-8) ("The
major land use in the lower Yellowstone River watershed is farming, and I'm concerned that
neonics from those farms and elsewhere are washing into the river"); Pengelley Decl. ¶ 9 (ECF
No. 24-11) ("The Willamette Valley and Oregon generally are no stranger to pesticides, and
there is plenty of opportunity for neonic use in and around the areas where we go hiking" and
noting concern about impacts from "neonics used" at a winery, residential housing development,
tree plantation and lawn seed growing fields "and elsewhere").

of truth, EPA need not show that they are of an "extravagantly fanciful nature," only that they are conclusory. *Iqbal*, 556 U.S. at 681. NRDC's "general allegations" that one or more of the hundreds of individual neonicotinoid pesticide products could be used in the general vicinities of its various individual members across the country are, at best, allegations "that are 'merely consistent with'" the possibility that the 59 particular products named in the complaint could have a geographic nexus with NRDC's members, and therefore "'stop[] short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (citation omitted); *Twombly*. 550 U.S. at 557, 561. There are simply no well-pleaded facts in NRDC's complaint that could give rise to a plausible inference that even the three neonicotinoid active ingredients (which are part of a larger class of neonicotinoid pesticide products), much less the 59 individual product registrations challenged in the complaint, have a geographic nexus with NRDC's identified members. *Id*. NRDC's supplemental declarations do not nudge the "general allegations" (Pl's Opp. at 11) of geographic nexus in NRDC's complaint "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. As such, NRDC may have "alleged — but it has not 'show[n]' — 'that [it] is entitled to relief'" under Rule 8(a)(2), and its complaint is therefore should be dismissed. *Iqbal*, 556 U.S. at 679.

Insofar as NRDC contends that its complaint should be spared dismissal because its "general allegations" (Pl's Opp. at 11) leave open the "possibility that [NRDC] might later establish some 'set of [undisclosed] facts'" showing a geographic nexus between the 59 products named in the complaint and its members, that is precisely the approach that the Supreme Court rejected in *Twombly* and *Iqbal*. "Rule 8 does not empower respondent to plead the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss." *Iqbal*, 556 U.S. at 687. "Rule 8 marks a notable and generous departure

from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of

discovery for a plaintiff armed with nothing more than conclusions[;] . . . . only a complaint that

states a plausible claim for relief survives a motion to dismiss." *Id*. at 678–79 (citation omitted).

The Supreme Court's admonitions are particularly apt in this case, where NRDC cannot

claim to need discovery or EPA's administrative records to produce evidence of its standing to

sue.  Furthermore, where, as in this case, "the allegations in a complaint, however true, could not

raise a claim of entitlement to relief, 'this basic deficiency should ... be exposed at the point of

minimum expenditure of time and money by the parties and the court.'" *Twombly* at 557–58

(citations omitted).  To that end, a district court "must retain the power to insist upon some

specificity in pleading before allowing a potentially massive factual controversy to proceed." *Id*.

at 558.  While the complaint in this case does not involve a factual controversy of the magnitude

presented in *Twombly*, its filing nonetheless has consumed, and continues to consume,

significant scarce agency resources.  NRDC's claims are subject to the scope and standard of

review of the Administrative Procedure Act ("APA"), which provides for judicial review of final

agency action based on "the whole record or those parts of it cited by a party." 5 U.S.C. § 706.

Each of the 59 registrations challenged in NRDC's complaint is an agency action with its own

administrative record containing the basis for that action.  7 U.S.C. §§ 136a(c)(3)(B) & 136w-

8(b)(3).  Thus, the filing of NRDC's complaint has required EPA to compile 59 separate

administrative records underlying each challenged action.  This is a significantly time-intensive

(*i.e.*, seven-month-long) process given the sheer number of registration actions that the complaint

challenges, combined with the fact that record for each action is not maintained in an indexed

docket, as would be the case for a rulemaking, but rather in an unindexed, often paper record

contained in the record file ("jacket"). As such, EPA staff must, by hand, scan individual

documents into digital form and create an index listing the records for each of the products.

As stated previously, if a complaint like NRDC's is allowed to survive a motion to

dismiss despite failing to plead any factual allegations that plausibly suggest a geographic nexus

between the individual product registrations that are challenged and the organization's individual

members, the only thing that seemingly would limit the number of product registrations that a

plaintiff could challenge – and the number of administrative records EPA would be required to

compile – would be the statute of limitations and the plaintiff's ambition.  Fortunately, "the

Federal Rules do not require courts to credit a complaint's conclusory statements without

reference to its factual context." *Iqbal*, 556 U.S. at 686.

NRDC's reliance on *Ctr. for Biol. Div. v. EPA*, 861 F.3d 174 (D.C. Cir. 2017) ("*CTP*"), is

misplaced for several reasons.  First, the *CTP* case did not involve pleading requirements

because no complaint was ever filed in that matter.  The *CTP* case was initiated in the Court of

Appeals in the first instance pursuant to the Federal Insecticide, Fungicide, and Rodenticide

Act's ("FIFRA") exclusive judicial review provision that bestows the Court of Appeals with

original jurisdiction.  Second, NRDC's suggestion that the D.C. Circuit found standing in *CTP*

based solely on the possibility that "plants or crops on which the products *could be used* were

located near the species or their critical habitat" (Pl's Opp. at 13-14) is a serious

mischaracterization.  As EPA explained in its motion to dismiss, the D.C. Circuit actually held in

*CTP* that, to prove standing, the plaintiff was required to "demonstrate that there [was] a

'*substantial probability*' that local conditions [would] be adversely affected and thus harm a

[plaintiff] member."  Fed. Defs' Mot. at 13-14 (ECF No. 17).  As explained above, there are no

well-pleaded facts in this case that could, if true, demonstrate a "substantial probability" of

11

impacts to local conditions.  Indeed, the D.C. Circuit's finding of "substantial probability" in
*CTP* was made in the context of three facts that are fundamentally distinct from this case.  First,
in *CTP* the plaintiff challenged *all* registered pesticide products containing the active ingredient
cyantraniliprole ("CTP").  Second, it was established that CTP was "used to combat pestilent
threats to the citrus and blueberry industries" and was "importan[t] to citrus and blueberry
growers especially."  861 F.3d at 180, 185.  Third, evidence had been provided regarding the
extent to which the habitats of the species of interest to the plaintiffs' members "overlapped with
those areas that contained cyantraniliprole-eligible crops."  *Id.* at 192.  Under these facts, it was
far more plausible in *CTP* that the particular products named in the complaint would affect local
conditions than it is here.

Indeed, the facts pleaded by NRDC here stand in stark contrast to those that were
established in the *CTP* case.  Here, NRDC does not challenge all pesticide products containing
the active ingredients imidacloprid, acetamiprid, or dinotefuran, but rather a small subset of the
"hundreds" of such products.  Compl. ¶¶ 5, 39.[5]  The 59 registered products identified in the

---

[5] NRDC asserts that its alleged injuries are redressable even though it challenges only select
product registrations because "consultation could result in pesticide restrictions or cancellations,
which would reduce the risks to NRDC's members' interests in viewing wildlife."  Pl's Opp. at
17.  NRDC does not explain, however, how the risks to its members actually could be reduced.
Vacating the 59 registrations challenged here would not prevent the use of acetamiprid,
dinotefuran, and imidacloprid in the hundreds of previously-registered products, and NRDC
makes no factual allegation upon which to plausibly infer that vacating the 59 challenged
registrations would have any impact on the amount of those active ingredients used in the areas
visited by its members.  *Id.*  To the contrary, it is plausible to infer that other registered neonic
products could take the place of the 59 products at issue in this complaint, given that they are
"me toos" of earlier registrations (*i.e.*, substantially similar or identical in use and formulation to
a product(s) already on the market or a combination of previously approved products).  Fed.
Defs' Mot. at 6, 18-19.  This case, therefore, is not like *Mass. v. EPA*, 549 U.S. 497, 525 (2007),
where the Court found that the risk of harm to the plaintiffs from global warming "would be
reduced to some extent" by regulation of motor vehicle emissions.  *Id.* at 526.  NRDC's
conclusory assertion that a favorable decision in this case "would reduce the risk of harm to
species NRDC's members wish to view" does not meet the standard of Rule 8.

complaint are not limited to the same types of crops, but rather are registered for different types of uses, by different methods of application, and in different geographic areas. Lastly, there are no well-pleaded factual allegations here that the different types of uses, methods of application, and geographic areas for which the 59 products identified in the complaint have been approved makes them likely to overlap with the particular areas where NRDC's members view their various species of interest. In sum, the *CTP* case provides no help to NRDC here.

NRDC's repeated assertion that the 59 products identified in the complaint are registered for "nationwide use" (Pl's Opp. at 14) also cannot save its complaint. The assertion is not only misleading (Fed. Defs' Mot. at 12-14), but too threadbare to support a plausible inference of the requisite geographic nexus. It is simply not plausible to infer that the 59 products identified in the complaint have been, or will be, applied in the particular areas used by NRDC's members simply because they are registered for "nationwide use." Rather than having been approved for use "anywhere in the United States," as NRDC implies, each of the 59 products at issue was evaluated and registered for the specific uses (*e.g.*, the crops, animals, areas, or objects to be treated) proposed by the applicant for registration. *See* 7 U.S.C. § 136a; *see also* 40 C.F.R. Parts 152-158 (EPA regulations for pesticide registration). Each of the 59 products has use directions and restrictions that limit its use to specific geographies and/or application areas. With limited exceptions, FIFRA makes it unlawful for any person "to use any registered pesticide in a manner inconsistent with its labeling." 7 U.S.C. § 136j(a)(2)(G).

In sum, NRDC has not established a plausible basis for its standing to challenge 59 specific pesticide product registrations in the absence of factual allegations showing that those particular products are likely to be applied in the particular areas used by its members. NRDC may not use "general allegations" regarding the entire class of neonicotinoid pesticide products

13

as a substitute for allegations regarding the particular product registrations it seeks to overturn. NRDC's complaint purports to challenge 59 separate agency actions (*i.e.*, product registrations) and, as such, NRDC must allege *facts* that could, if true, establish standing to challenge each of those actions.  NRDC's burden to establish standing here is a heavy one because its members are not the object of the government regulation that it seeks to challenge.  The organization's complaint falls far short of carrying this heavy burden, and therefore should be dismissed.

### B.     NRDC Disclaims Bringing a Programmatic Challenge, But Its Complaint Has the Trappings of a Programmatic Challenge Nonetheless.

In its motion to dismiss, EPA made two separate, but related, arguments that stem from NRDC's "general allegations" approach to pleading, namely that NRDC's complaint, in effect, improperly targets the active ingredients imidacloprid, acetamiprid, and dinotefuran, which are not agency actions (Fed. Defs' Mot. at 14-17), and amounts to an improper programmatic attack because it essentially seeks to air NRDC's generalized grievance against EPA's registration of the many hundreds of neonicotinoid pesticides containing those active ingredients (*id*. at 19-22). In fact, NRDC's complaint can fairly be read as presenting an even broader grievance than against three active ingredients, but rather against the entire class of neonicotinoid pesticides, which encompasses far more than just imidacloprid, acetamiprid, and dinotefuran.  *Contra National Wildlife Fed'n*, 497 U.S. at 893 (plaintiffs could not aggregate numerous discrete agency actions in an effort to obtain "wholesale correction" of an alleged agency program).

NRDC mischaracterizes the first argument as merely questioning the "organization of NRDC's complaint."  Pl's Opp. at 18.  Far from challenging the mere organization of NRDC's complaint, EPA disputes the basic premise of NRDC's lawsuit that all registered products containing imidacloprid, acetamiprid, or dinotefuran are equivalent to one another, respectively, and can be challenged *en masse* with the mere allegation that those products share an active

14

ingredient.  Individual product registrations are not fungible, even if they contain the same active

ingredient.  Different products are registered for different types of uses, by different methods of

application, and in different geographic areas.  Ergo, alleging a geographic nexus with and

injury-in-fact from an active ingredient(s) – or neonicotinoid pesticides generally – does not

automatically bestow standing to challenge the registration of any individual product that

contains that active ingredient or is in that class.  *Ctr. for Biol. Div. v. EPA*, No. 11-CV-00293-

JCS, 2013 WL 1729573 (N.D. Cal. Apr. 22, 2013).  Such allegations also do not support a claim

for relief against discrete agency action because EPA did not register imidacloprid, acetamiprid,

or dinotefuran in the abstract or, for that matter, the entire class of neonicotinoid pesticides.

EPA is not seeking here to compel NRDC to undergo a rote exercise of "repeat[ing] [the

same] claims and allegations fifty-nine times" (Pl's Opp. at 18), but rather to "demonstrate

standing separately for each form of relief sought," *Friends of the Earth v. Laidlaw Envtl. Servs.*,

528 U.S. 167, 185 (2000), by pleading facts showing a plausible geographic nexus between each

of the 59 individual pesticide registrations challenged in the complaint and the species of interest

to NRDC's member(s).  This is required because, as the Supreme Court has explained, "standing

is not dispensed in gross" and because "[i]f the right to complain of one administrative

deficiency automatically conferred the right to complain of all administrative deficiencies, any

citizen aggrieved in one respect could bring the whole structure of state administration before the

courts for review."  *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996).  NRDC's mischaracterization

of EPA's argument is emblematic of the fundamental problem with its approach to this litigation.

NRDC's organization of the complaint is not the issue.  The issue is that NRDC's boilerplate

claims and conclusory allegations do not state plausible claims for relief under Rule 8, and its

gathering of dozens of different product registrations together in a single cause of action solely

because the products share an active ingredient fails to challenge discrete agency action because EPA did not register all of those products *en masse* in a single action.  NRDC should not be heard to complain that being required to plead facts specific to each challenged product registration would be "unnecessarily long."  Pl's Opp. at 18.  NRDC made a conscious decision here to file suit against numerous separate agency actions.  A "product-by-product" or "action-by-action" approach to standing may be "understandably frustrating to an organization such as [NRDC's], which has as its objective across-the-board protection of our Nation's wildlife . . . ," but that approach "is the traditional, and remains the normal, mode of operation of the courts." *Nat'l Wildlife Fed'n*, 497 U.S. at 894.

With regard to EPA's second argument, NRDC disclaims the contention that it is, in essence, attempting to bring an improper programmatic challenge because it "does not seek relief as to all pesticides containing the active ingredients, nor [does] NRDC allege[] that EPA's actions constitute an improper program or pattern and practice."  Pl's Opp. at 21.  That may be true, but the problem is that if NRDC is allowed to challenge individual product registrations based on its generalized grievance against the entire class of neonicotinoid pesticide products (Compl. ¶¶ 1, 5, 39), then NRDC is, in essence, being allowed to bring a programmatic challenge notwithstanding its disclaimer.  The theory of recovery is based not on EPA's approval of the 59 individual pesticide product registration decisions that are challenged in the complaint, but rather on EPA's alleged failure to consult on neonicotinoid pesticides, writ large.  *Id.* ¶¶ 85, 90, 95. NRDC should not be permitted to obtain *de facto* review of EPA's registration of all neonicotinoid pesticide products without consultation under the guise of a challenge to its registration of particular products.  *Nat'l Wildlife Fed'n*, 497 U.S. at 892-93.  Rather, NRDC should be required to plead facts that plausibly support actual causes of action, including its

standing, against discrete agency actions.  *Ctr. for Biological Diversity*, 2013 WL 1729573.[6]  To

allow its "general allegations" approach would be to allow a *de facto* programmatic challenge to

EPA's entire category of neonicotinoid pesticide product registrations.

## III.    Conclusion

For all of the reasons set forth above and in EPA's motion to dismiss, the complaint in

the above-captioned matter should be dismissed.

Dated: May 4, 2018

> Respectfully Submitted,
>
> JEFFREY H. WOOD, Acting Assistant Attorney General
> U.S. Department of Justice
> Environment & Natural Resources Division
>
> /s/ *Robert P. Williams*
> ROBERT P. WILLIAMS, Sr. Trial Attorney (SBN 474730 (DC))
> Wildlife & Marine Resources Section
> Ben Franklin Station, P.O. Box 7611
> Washington, D.C. 20044
> Tel: (202) 305-0210 | Fax: (202) 305-0275
> Email: robert.p.williams@usdoj.gov
>
> ***Attorneys for Defendants***

---

[6] As EPA explained in its motion to dismiss, the court in *Ctr. for Biological Diversity*, 2013 WL 1729573, dismissed a complaint analogous to NRDC's for failure to plead a plausible factual basis for standing to challenge the identified pesticide products. Fed. Defs' Mot. at 8-9, 16. NRDC has no meaningful response to that decision, asserting only that, following dismissal, the plaintiffs filed an amended complaint that categorized the plaintiffs' claims by active ingredient and that, subsequently, "the Ninth Circuit validated this format."  Pl's Opp. at 19-20.  As an initial matter, EPA does not merely challenge the format of NRDC's complaint, but rather its lack of sufficient factual allegations.  Additionally, NRDC's assertion that the "Ninth Circuit validated" pleading claims en masse against active ingredients is plainly incorrect.  The Ninth Circuit did not consider either the plaintiffs' standing or the question of whether the plaintiffs could use generalized grievances against active ingredients as a basis for challenging individual product registrations because EPA had not moved to dismiss on either of those grounds.  In fact, following the case's return to district court from the Ninth Circuit, the plaintiffs filed a third amended complaint.  EPA has moved to dismiss that complaint for lack of standing, and that motion is currently pending in district court.  Simply stated, the Ninth Circuit decision in *Ctr. for Biological Diversity* has no bearing on EPA's motion to dismiss here.